IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WERTH MARC V. ZUVER, | ) | Civil Action No.: 16-CV-2505 |
| 2456 20th Street NW, Apt. 505 | ) | Hon.: |
| Washington, DC 20009 | ) | |
| | ) | |
| Plaintiff, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| vs. | ) | |
| | ) | |
| GREGORY SPRIGG, | ) | |
| 9109 Crooked Run Rd | ) | |
| Basye, VA 22810-2074 | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

## PRELIMINARY STATEMENT

1.      Plaintiff Werth Marc V. Zuver, an 87-year-old veteran and cancer survivor, brings

this action against Defendant Gregory Sprigg, a licensed real-estate broker, who duped Mr.

Zuver into a fraudulent, unconscionable, and unjust real estate transaction that resulted in the loss

of his life's savings.

2.      Mr. Zuver has lived in the Dupont Circle neighborhood for 48 years and once had

a flourishing nonprofit dedicated to his life's passion for multicultural artists and art.  Starting in

2005, Mr. Zuver experienced turmoil: he was diagnosed with cancer, his closest relative and

long-time girlfriend both died, and his nonprofit organization declined financially, in part

because Mr. Zuver was focused on personal issues.  Amid the nonprofit's financial difficulties,

the nonprofit had to sell the property from which it operated at 2112 R Street, NW ("2112 R").

The property also served as Mr. Zuver's personal residence.

3.      In this distressed state, Mr. Zuver turned to his neighbor of over 17 years in an effort to remain in the neighborhood where he has lived for most of his adult life.

4.      Gregory Sprigg is a licensed and experienced real estate broker in Washington, DC who owned the property at 2110 R Street, NW ("2110 R"), which is next door to Mr. Zuver's old home.  Between 1996 and 2013, Mr. Sprigg and Mr. Zuver developed a friendly relationship, and as neighbors, Mr. Sprigg witnessed and became aware of the decline of Mr. Zuver's health and nonprofit.

5.      Defendant Sprigg used his superior real estate experience to take advantage of Mr. Zuver's inability to protect his interest due to age, declining health, lack of business sophistication, and precarious housing situation to swindle Mr. Zuver out of significant amounts of money in a complex real estate transaction.  In furthering his aim to exploit Mr. Zuver financially, Defendant Sprigg engaged in various tactics to isolate Mr. Zuver, including refusing to contract with anyone other than Mr. Zuver regarding the transaction.

6.      Defendant Sprigg and Mr. Zuver entered into real estate contracts signed over the course of two and half years, which included an earnest money deposit of $200,000 and pre-settlement occupancy payments between $10,000 and $15,000 a month for use of only the ground floor of the property, and eventually a single room on an upper floor by appointment only, as a personal residence for Mr. Zuver and storage for his art.  Defendant Sprigg wrongfully acquired in excess of $450,000 from Mr. Zuver in the course of the real estate transaction.

7.      The contract terms prohibited Mr. Zuver from using the property as his nonprofit and prohibited public access.  Defendant Sprigg made promises to credit payments made over the course of the parties' dealings towards the purchase of the property misleading Mr. Zuver

into believing that the transaction was akin to a rent-to-own arrangement, in which all of the excessive payments would ultimately be used towards the purchase of the property.

8.      Over the course of the transaction, Defendant Sprigg learned the details of Mr. Zuver's financial assets.  Despite knowing that Mr. Zuver did not have sufficient funds to purchase the property at the agreed price of over $1.8 million, Mr. Sprigg continued to have Mr. Zuver enter into and release a series of real estate contracts in an effort to deplete Mr. Zuver of any and all cash available.  Defendant Sprigg had Mr. Zuver enter into two separate contractual releases with terms forfeiting the deposits Mr. Zuver paid toward the purchase of the home.  He also had Mr. Zuver enter into new contracts forfeiting the promise of credits for pre-settlement occupancy payments made under previous contracts.

9.      Mr. Zuver brings this action against Defendant Sprigg, seeking compensatory, treble, and punitive damages, declaratory relief, equitable relief, restitution, attorneys' fees, and any additional relief deemed justified by the Court pursuant to the following claims: (1) violations of the District of Columbia Consumer Protection Procedures Act ("DCCPPA"), D.C. Code § 28-3904(r), based on unconscionability; (2) violations of the DCCPPA, D.C. Code § 28-3904(e-f), based on misrepresentation or omission; (3) unjust enrichment due to undue influence; (4) unjust enrichment based on unconscionability; (5) unjust enrichment based on liquidated damages provisions that amount to an unenforceable penalty; (6) fraud; (7) negligent misrepresentation; and (8) breach of fiduciary duty.

## PARTIES

10.     Plaintiff Werth Marc V. Zuver is a United States citizen and resident of the District of Columbia.

3

11.     Defendant Gregory Sprigg is a United States citizen and a resident of Virginia who, as a real estate broker licensed in Washington, DC regularly conducts business throughout this District.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000.

13.     This Court has personal jurisdiction over the Defendant because he conducts business in this District, including the real estate transaction here, and because a substantial part of the events or omissions giving rise to the claims alleged in the Complaint occurred in, was directed at, and/or emanated from Washington, DC.

14.     This Court has personal jurisdiction over the Defendant pursuant to D.C. Code § 13-423(a)(1)-(5).

15.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events complained of herein occurred in Washington, DC.

## FACTUAL BACKGROUND

**Mr. Zuver's Early Years**

16.     Mr. Zuver was born in Paris, France and is currently 87 years old.  He grew up in France, Cuba, New York, NY and Washington, DC.  Between 1954 and 1958, Mr. Zuver served in the United States Army as a Russian and German interpreter and an Armed Forces Network broadcaster.  From 1958 to 1960, Mr. Zuver attended UC Berkeley on the G.I. Bill and earned a degree in French and Political Science.  From 1960 to 1964, Mr. Zuver studied International Relations at Yale, earning a master's degree and completing work towards a PhD.

17.     Mr. Zuver has dedicated his career to his passion of promoting multicultural artists and art, which at the time of his founding of a coalition of artists in 1968, were often not included in mainstream museums or art galleries.

18.     That same year, he leased 2112 R in Dupont Circle at a time when the neighborhood experienced a decline.  Dupont Circle is now known to appeal to artists and has several boutique art galleries and the renowned Phillips Collection.

19.     In 1973, Fondo del Sol ("Fondo") was incorporated as a non-profit with a focus on multicultural art.  Fondo del Sol means "depth of the sun" in English.  Mr. Zuver frequently hosted visiting artists and held Fondo programs at his home.

20.     Tourists, neighbors, and fellow art lovers frequently visited Mr. Zuver's home-based art center.  Mr. Zuver also received modest funding to support himself and the nonprofit by conducting traveling exhibitions to universities and public grade schools, among other activities.

21.     Indeed, Mr. Zuver and Fondo always had the support of professionals to handle the business dealings of the nonprofit, including lawyers, accountants, and real estate professionals as friends, volunteers, and board members.

22.     In 1997, Defendant Sprigg purchased the neighboring property at 2110 R. Mr. Zuver and Defendant Sprigg developed a friendship over the years, which included Mr. Zuver's admiration of Defendant Sprigg's mother, also an artist.

23.     In 2000, Fondo purchased 2112 R, and Mr. Zuver used his entire family inheritance of approximately $100,000 towards the purchase.  The board members, rather than Mr. Zuver, handled the negotiations and documentation for the purchase.  Mr. Zuver continued to reside in the property.

**Mr. Zuver's World Gets Turned Upside Down**

24.     Unfortunately for Mr. Zuver, the challenges of aging began to take a toll, and he was unable to keep pace with his normal operation of Fondo.

25.     Beginning in 2005, Mr. Zuver experienced a series of life-altering changes as he entered his senior years.  During this time, both Mr. Zuver's sister, his only close relative, and his long-time girlfriend died.  In 2010, Mr. Zuver was diagnosed with colon cancer.

26.     Unable to commit full time to Fondo due to illness and aging, the nonprofit quickly experienced financial difficulty and lost its 501(c)(3) status, which resulted in a dispute over the taxes owed to the District.  Accordingly, in September 2012, Fondo, upon the advice and assistance of the Fondo board and pro bono counsel, sold 2112 R for $955,000.

27.     The proceeds from this sale, after resolving debts and the tax issue with the District, totaled approximately $414,000, and Mr. Zuver and the Fondo board agreed to set aside some funds for Mr. Zuver for his contributions.

28.     Also, during this time the dedicated supporters of Fondo also aged and developed severe health issues, and the volunteers and supporters of Fondo were not as frequently available.

29.     With no living close relatives, spouse, or children, Mr. Zuver was left to oversee his affairs, including finding a new personal residence and storage for Fondo's voluminous art collection.  The purchaser of 2112 R, an art photographer, permitted Mr. Zuver to occupy space in the building for a year without payment as part of the purchase agreement.

30.     Although Mr. Zuver held onto the stubborn belief that he was as independent and capable as he had always lived, Mr. Zuver's ability to protect his own interest and make well-thought-out decisions had waned with his age and lack of personal business savvy.

**Mr. Zuver Turns to a Trusted and Respected Neighbor**

31.     Mr. Zuver needed to find a new home and, ideally, a new place to house the extraordinary Fondo collection.

32.     From their conversations, Mr. Zuver knew that Defendant Sprigg was an experienced real estate broker.  Mr. Zuver trusted Defendant Sprigg because of his superior real estate knowledge and what Mr. Zuver then thought were shared values.

33.     Also from conversations and observation as an immediate next door neighbor, Defendant Sprigg was aware that Mr. Zuver was elderly, had suffered a bout with cancer, was steadfastly holding on to the one remaining constant in his life, the art center, and most importantly, had no family.  As a neighbor and real estate broker, Defendant Sprigg also knew that Mr. Zuver was in urgent need of a new home and that the neighboring property had sold for close to $1,000,000.

34.     Mr. Zuver knew that Defendant Sprigg was planning to move to his newly built home in Shenandoah County, Virginia, which is where Defendant Sprigg presently resides. When Mr. Zuver inquired of Defendant Sprigg about the possibility of renting or buying Defendant Sprigg's home at 2110 R, Defendant Sprigg refused to rent any portion of the property, but was willing to discuss a purchase of the property.

**Exploratory Period**

35.     From the outset, as a real estate broker that has served both buyers and sellers, Defendant Sprigg should have known that such a purchase was unsuitable for a person of Mr. Zuver's age and means.

36.     Defendant Sprigg mislead Mr. Zuver from the beginning.  Defendant Sprigg led Mr. Zuver to believe that their arrangement would function like a "rent-to-buy," in which

Defendant Sprigg agreed to credit payments that Mr. Zuver made under the contract towards the purchase price.

37.     Between October and December 2013, Defendant Sprigg and Mr. Zuver began exploring the possibility of Mr. Zuver, then an 84-year-old retiree with no income aside from approximately $700 per month in social security, purchasing a property for well over $1,800,000.

38.     The parties entered into an undated agreement ("Exploratory Agreement") in which Defendant Sprigg demanded $20,000 purportedly to compensate him for lost income and expenses while he kept portions of the property vacant during a two month "exploratory period" starting November 1, 2013, and ending December 31, 2013 for the parties to discuss the possibility of financing and purchase of the property.   Exhibit 1.

39.     The property was going to be used as Mr. Zuver's personal residence, and eventually Mr. Zuver had hopes of using it for his nonprofit as an art center.  At the time of negotiations and contracting, it was unclear whether the property could even get zoning as an art center.  In any event, at all times relevant to the transaction, Defendant Sprigg refused to allow the property to be used as an art center or public space.

40.     Defendant Sprigg promised to give Mr. Zuver a full credit of amounts paid under the Exploratory Agreement upon contracting for the purchase of the property with a settlement date set for January 31, 2014.

41.     The Exploratory Agreement also offered Mr. Zuver the opportunity to extend settlement of the property to April 30, 2014 for additional payments.

42.     Defendant Sprigg had other tenants in the property during the exploratory period.

**Circumstances Leading to the Signing of Sales Contract No. 1**

43.     By early December 2013, Defendant Sprigg had prepared a purchase contract, which he misrepresented as boilerplate.

44.     Defendant Sprigg also began transmitting e-mail communications to Mr. Zuver through Mr. Zuver's then girlfriend and now fiancée, Ms. Delfa Castillo, because he knew that Mr. Zuver was not computer savvy.  When Ms. Castillo informed Defendant Sprigg that she did not wish to get involved in the negotiations or the transaction because she was only Mr. Zuver's girlfriend, Defendant Sprigg continued to send her e-mail communications for his own convenience.  In fact, during the course of the transaction, Defendant Spigg ridiculed and complained about Mr. Zuver's lack of computer savvy and stated that Mr. Zuver "needed to catch up to the 21st Century."

45.     Defendant Sprigg knew that Mr. Zuver lacked the ability to protect his interest despite inquiring about whether Mr. Zuver had reviewed the sales contract with a lawyer.

46.     The evidence will show that Defendant Sprigg only gave lip service to written encouragements for Mr. Zuver to have attorney review of the agreements, which was done to further his scheme of presenting himself as a trusted friend who was looking out for Mr. Zuver's interest.  However, he would verbally tell Mr. Zuver that attorneys were unnecessary and would only "muck things up."

47.     Indeed, Ms. Castillo informed Defendant Sprigg that Mr. Zuver had not had an attorney review the contract on the eve of signing the first contract, even though they did try to speak with an attorney.  She also informed Defendant Sprigg that she was leaving it up Defendant Sprigg, Mr. Zuver, and the former chairman of Fondo's board to handle the transaction.  The former chairman of Fondo's board is also elderly and suffering serious illness.

48.     Accordingly, before signing the contract Defendant Sprigg knew that Mr. Zuver was an elderly individual who was vulnerable and did not have the support of family members or anyone with legal authority to prevent him from entering into this unconscionable, one-sided deal in Defendant Sprigg's favor.  He also knew that that Mr. Zuver had to vacate his prior longtime residence with limited options to remain in the neighborhood.

**Sales Contract No. 1**

49.     On or around December 26, 2013, Defendant Sprigg and Mr. Zuver entered into a Regional Sales Contract ("Sales Contract No. 1") for the purchase of the Property with a settlement date of April 30, 2014.  Exhibit 2.

50.     Sales Contract No. 1 included a sales price of $1,845,000, with a $1,200,000 down payment and $645,000 in seller provided financing with a 15-year mortgage.

51.     Pursuant to Sales Contract No. 1, Mr. Zuver was to deliver a $200,000 earnest money deposit to Chasen and Chasen PLLC as escrow agent ("Chasen").

52.     Sales Contract No. 1 also included a pre-settlement occupancy ("Pre-settlement Occupancy No. 1").  Pre-settlement occupancy agreements are uncommon because they carry substantial risks for both sellers and buyers, and the agreements are typically used in circumstances where a buyer must vacate his or her current residence before settlement of the new house occurs.

53.     The Greater Capitol Area Association of Realtors ("GCAAR") standard pre-settlement occupancy form explicitly provides that nothing in the agreement "shall constitute a tenant and landlord relationship between Seller and Buyer," and indeed, Defendant Sprigg explicitly disclaimed that the pre-settlement occupancy agreement between him and Mr. Zuver created a tenancy.

54.     However, Defendant Sprigg misrepresented the pre-settlement occupancy
agreement as similar to a rent-to-buy arrangement in order to persuade Mr. Zuver to enter into a
transaction that included excessive monthly pre-settlement occupancy payments.  In addition to
the standard GCAAR Pre-settlement Occupancy form, Defendant Sprigg used a non-boilerplate
General Addendum in which Defendant typed complex, excessive, and unconscionable terms all
in Defendant Sprigg's favor.

55.     Pre-settlement Occupancy No. 1 reiterates that "[s]eller is a licensed real estate
broker in DC" and states that the "seller makes no representation as to the ability of the buyer to
obtain zoning permission for any use other than residential."

56.     The terms of Pre-settlement Occupancy No. 1 are as follows:

a.      A "non-refundable lump sum payment of $40,000, based on
$10,000/month for the months of January 2014 through April 2014 for
occupancy of the ground floor only."  This amount was in addition to the
$200,000 deposit for the purchase of the property.

b.      Permission to use the ground floor only for "storage of artwork and other
personal property and the temporary residence of no more than two people
until settlement."

c.      A disclaimer that the agreement did not create a tenancy.

d.      A prohibition against public access and the hanging of "anything on the
walls or . . . any alterations to the property whatsoever."

e.      "Seller will credit Buyer $50,000 at settlement."

57.     Pursuant to the terms of Pre-settlement Occupancy No. 1, "[i]f settlement does not
occur by April 30th [sic], 2014, and Buyer fails to vacate the ground floor by April 30th [sic],

2014, Buyer agrees that the monthly payment for the ground floor shall increase to $12,000/month and that Seller may offer the upper floors of 2110 R for rent to other parties with no reduction in the $12,000 monthly payment owed by Buyer until Buyer vacates the property."

58.     Upon information and belief, Defendant Sprigg had other tenants in the property throughout the duration of Sales Contract No. 1.

**Extension and Release of Sales Contract No. 1**

59.     Defendant Sprigg mostly acted reasonably during the beginning of Sales Contract No. 1, and often offered advice for the maintenance of the home and purchased plants for Mr. Zuver to grow in the garden.  However, he explicitly disclaimed that the arrangement was as a rental and denied the creation of any tenancy.

60.     He also agreed to extend Sales Contract No. 1 to September 21, 2014, maintaining the monthly payment at $10,000, instead of increasing the monthly payment to $12,000.

61.     However, Defendant Sprigg began to show signs of his true intentions.

62.     Out of frustration of requests to make repairs, Defendant Sprigg informed Ms. Castillo that real estate professionals strongly recommend against pre-settlement occupancy because it involves too much risk for sellers.  However, he had previously referred to the contract terms as standard and boilerplate.

63.     By August 2014, if not earlier, Defendant Sprigg listed the property on real estate search databases.  He also inquired about Mr. Zuver's readiness to settle in September 2014 and learned that Mr. Zuver has access to only approximately $200,000.  He also discovered that Mr. Zuver had attempted to raise money to fund the purchase and that such fundraising had proved unsuccessful.

64.     Over the next several weeks, Defendant Sprigg continued to inquire if Mr. Zuver would be ready to go to settlement on September 21, 2014, despite knowing that no additional funds had been raised.

65.     He further represented to Ms. Castillo that he was willing to give Mr. Zuver additional time to raise the money to purchase the property until November 1, 2014, for an additional pre-occupancy payment of $10,000, but only pursuant to a "gentleman's agreement."

66.     He also represented to Ms. Castillo that Sales Contract No. 1 would be released on September 21, 2014, but omitted that the release would forfeit the $200,000 deposit and credit for the monthly pre-occupancy payments.  Instead, Defendant Sprigg represented that he would honor the terms, including the $50,000 credit, of Sales Contract No. 1.

67.     Ms. Castillo expressed concern with the "gentleman's agreement" and informed Defendant Sprigg that she wanted Mr. Zuver and his board to have attorney review.

68.     Defendant Sprigg began to notice that Ms. Castillo, a retired attorney, had increasing influence and an eye toward protecting Mr. Zuver's interests.  Accordingly, Defendant Sprigg isolated Mr. Zuver by meeting with him alone outside of 2110 R and out of Ms. Castillo's sight.  During one of these isolated meetings on September 22, 2014, Defendant Sprigg had Mr. Zuver sign the release of Sales Contract No. 1 ("Release No. 1"). This release authorized Chasen to disburse the initial $200,000 deposit to Defendant Sprigg. Exhibit 3.

69.     Days after the release was signed, Defendant Sprigg informed Ms. Castillo that the deposit was forfeited, but promised to credit it and the monthly payments in the second sales contract.

70.     Defendant Sprigg then demanded payment for half of the taxes and insurance of the property, which he represented Mr. Zuver verbally agreed to pay.

**Sales Contract No. 2**

71.     In pacifying the push for a written agreement, Defendant Sprigg prepared a second contract and represented the agreement as very advantageous to Mr. Zuver with straightforward terms.  He had also used his real estate expertise in representing that Mr. Zuver would have a difficult time finding a seller to be as patient as he had been.

72.     On or around October 10, 2014, Defendant Sprigg and Mr. Zuver entered into a second Regional Sales Contract ("Sales Contract No. 2") with a settlement date of December 31, 2014.  Exhibit 4.

73.     Defendant Sprigg entered into this second contract with no evidence that Mr. Zuver had generated any funds to purchase the property and with no reasonable expectation that Mr. Zuver could raise over $1,000,000 in two and half months before the next settlement date.

74.     Sales Contract No. 2 included a sales price of $1,600,000 with a $1,000,000 down payment and $600,000 in seller provided financing.  The lowered sales price purportedly reflects the promised return of the $200,000 deposit forfeited when Defendant Sprigg induced Mr. Zuver to sign the release for Sales Contract No. 1.

75.     Pursuant to Sales Contract No. 2, Mr. Zuver was to deliver a $5,000 deposit to Chasen.

76.     Sales Contract No. 2 also included a pre-settlement occupancy ("Pre-settlement Occupancy No. 2"), with the same terms as Pre-settlement Occupancy No. 1 with the following changes:

a.     A "non-refundable lump sum payment of $30,000, based on $10,000/month for the months of October 2014 through December 2014 for occupancy of the ground floor only."

b.     Removal of the clause giving settlement credit.

77.     Pursuant to the terms of Pre-settlement Occupancy No. 2, "[i]f settlement does not occur by December 31, 2014, and Buyer agrees that the monthly payment for the ground floor shall increase to $12,000/month and that Seller may offer the upper floors of 2110 R for rent to other parties with no reduction in the $12,000 monthly payment owed by Buyer until Buyer vacates the property."

78.     Despite receiving yet another update that fundraising efforts were unsuccessful, Defendant Sprigg sought to have Mr. Zuver go to settlement in late December 2014.

79.     On or around January 5, 2015, the settlement date of Sales Contract No. 2 was extended by a General Addendum in exchange for a $10,000 payment for the month of January 2015 "as per the pre-settlement occupancy agreement."  The General Addendum also provided that "[a]ll other provisions of the contract remain unchanged."

80.     Pursuant to a Release Agreement dated January 30, 2015 ("Release Agreement No. 2"), Sales Contract No. 2 was released, which forfeited the $5,000 deposit paid to Chasen thereunder.  Exhibit 5.

**Sales Contract No. 3**

81.     Again, aware that no additional funds had been raised, Defendant Sprigg moved

forward with a third sales contract.

82.     On January 30, 2015, the same date as the release of Sales Contract No. 2,

Defendant Sprigg and Mr. Zuver entered into a third Regional Sales Contract ("Sales Contract

No. 3") with a settlement date of September 30, 2015.  Exhibit 6.

83.     Sales Contract No. 3 included a sales price of $1,700,000 with a $1,000,000 down

payment and $700,000 in seller provided financing.

84.     Pursuant to Sales Contract No. 3, Mr. Zuver was to deliver a $5,000 deposit to

Chasen.

85.     Sales Contract No. 3 also included a pre-settlement occupancy ("Pre-settlement

Occupancy No. 3"), with the same terms as Pre-settlement Occupancy No. 1 with the following

changes:

> a.     "$20,000 for February and $15,000/month on the first of each month for
>
> March 2015 through September 2015 for occupancy of the ground floor
>
> only."
>
> b.     "Upon settlement only Seller will credit Buyer $5,000/month for each
>
> month paid."
>
> c.     "During the months of March 2015 through September 2015 Buyer is
>
> permitted to use the south rooms on the first floor (the au pair suite) solely
>
> for use as a representative sculpture exhibition space for 15 or fewer
>
> sculptures.  The first floor space is not to be used for any other purpose
>
> and shall not be construed to create a tenancy.  Buyer will have limited

> access to this space only by appointment for showing the property to
> prospective gallery investors."

86.     Pursuant to the terms of Pre-settlement Occupancy No. 3, "[i]f settlement does not occur by September 30, 2015 Buyer agrees that the monthly payment for the ground floor only shall increase to $12,000/month and that Seller may offer the upper floors of 2110 R for rent to other parties or sale to other parties with no reduction in the $12,000 monthly payment owed by Buyer until Buyer vacates the property."

87.     Apparently Defendant Sprigg forgot that he had already raised the monthly payments in carrying out his scheme in drafting the third contract.

**Retention of Large Law Firm**

88.     Throughout the period of Sales Contract No. 3, Defendant Sprigg sought periodic status reports of the fundraising effort and received the same response that the efforts had proven unsuccessful.  In August 2015, he learned that Mr. Zuver had approximately $20,000 left.

89.     Undeterred in his efforts to drain Mr. Zuver of any and all funds available, Defendant Sprigg pressed forward with the September 30, 2015 closing.

90.     However, Ms. Castillo's influence in the relationship strengthened, and she encouraged Mr. Zuver to initiate several steps in an effort to thwart Defendant Sprigg's scheme.

91.     First, Mr. Zuver attempted to get the contract changed to Mr. Zuver's new nonprofit's name, which Defendant Sprigg refused arguing that the contract had always been between him and Mr. Zuver as an individual.  He suggested that Mr. Zuver continue with purchasing the property as an individual because he did not want to deal with selling the property to a group of volunteers trying to raise money, and that Mr. Zuver could later sell the property to the nonprofit.

92.     Second, Mr. Zuver and Ms. Castillo sought an appraisal of the property to which Defendant Sprigg falsely represented was unimportant to buyers who would be willing to pay cash for property in the surrounding neighborhood.

93.     When Defendant Sprigg sought to obtain a third release, Ms. Castillo informed him that Mr. Zuver had retained a large law firm as pro bono counsel to review the release and real estate transaction.

94.     Defendant Sprigg decreased his responses to Ms. Castillo's e-mails, especially after Ms. Castillo informed Defendant Sprigg that the attorneys from the law firm were attempting to reach him.

95.     He finally resurfaced in late October 2015 offering to return the $5,000 deposit paid under Sales Contract No. 3 because he no longer desired to proceed with the contract.

96.     When Mr. Zuver informed Defendant Sprigg that the  attorneys advised him not to pay any more money, Defendant Sprigg played on Mr. Zuver's sense of honor and told Mr. Zuver that he was acting in bad faith and was not honoring his word.

97.     Mr. Zuver began moving his belongings out of the property after refusing to make any additional payments.

**Defendant Sprigg Attempts to Contract a Final Time**

98.     By January 2016, the law firm discontinued its representation of Mr. Zuver.

99.     Mr. Zuver, however, had accumulated a massive amount of artwork over the nearly five past decades with no location to store it.  Accordingly, he still had items stored on the ground floor of 2110 R.

100.     Again preying on Mr. Zuver's vulnerability, Defendant Sprigg demanded $10,000 in exchange for a one month license agreement, which allowed Mr. Zuver's nonprofit to use the

ground floor solely for storage purposes for March 2016.  This agreement did not permit

Mr. Zuver to reside in the property.

101.    Defendant Sprigg also agreed to begin discussions for Mr. Zuver's nonprofit to

purchase the property.  However, by April 2, 2016, Defendant Sprigg demanded that Mr. Zuver

completely vacate the property.

102.    Defendant Sprigg eventually sold the Property on July 29, 2016 for $1,725,000 to

GBM BD 2110 R LLC.

103.    The Property is currently listed for rent as four separate units for a total monthly

rental income of approximately $13,890.  The ground floor where Mr. Zuver formally occupied

is listed for $3,510, substantially less than the amount that Defendant Sprigg forced Mr. Zuver to

pay under the terms of the unconscionable real estate transaction.

104.    To date, Defendant Sprigg has not returned any of the money, although he has

acknowledged to Mr. Zuver and other witnesses that he wrongfully took the money.

**COUNT I – VIOLATIONS OF DCCPPA § 28-3904(r)**
**(Unconscionability)**

105.    Plaintiff repeats the allegations of the preceding paragraphs as if fully set forth

herein.

106.    Plaintiff brings this Count against Defendant pursuant to Section 28-

3905(k)(1)(A) of the DCCPPA, which provides that "[a] consumer may bring an action seeking

relief from the use of a trade practice in violation of a law of the District."

107.    Defendant Sprigg's acts of using his superior real estate knowledge in brokering a

deal for a pre-settlement occupancy and sale of 2110 R to Mr. Zuver constitute trade practices

that are regulated by the DCCPPA.

108.    Mr. Zuver is a "consumer" within the meaning of D.C. Code § 28-3901(a)(2) because he is a person that does and would purchase or lease a consumer good as a buyer of real estate that he intended to use as his personal residence.

109.    Defendant Sprigg is a "merchant" within the meaning of D.C. Code § 28-3901(a)(3) because he is a person who in the ordinary course of business does and would sell, lease or broker a consumer good as a licensed real estate broker.

110.    The sale of 2110 R constitutes "goods and services" within the meaning of D.C. Code § 28-3901(a)(7), which expressly includes real estate transactions.

111.    Defendant Sprigg violated D.C. Code § 28-3904(r) by knowingly taking advantage of Mr. Zuver's inability to protect his interest because of his age, physical or mental infirmities, ignorance, or vulnerable housing situation, among similar factors in using his superior bargaining power to make or enforce unconscionable terms or provisions of the sale of 2110 R, including but not limited to, excessive deposits and pre-settlement occupancy payments.

112.    Mr. Zuver entered into agreements with Defendant Sprigg for the purchase of 2110 R.  Mr. Zuver is an elderly man on a fixed income, and amid financial difficulties and the loss of his home, he sought to purchase a new house so he could remain in the same neighborhood where he has lived for most of his life.

113.    Defendant Sprigg, a licensed real estate broker, took advantage of Mr. Zuver and induced him to enter into agreements containing unusual and excessive terms.

114.    The terms of the agreements are substantively unfair and unreasonably favor Defendant Sprigg.  The terms of the transaction included a $210,000 earnest money deposit, a $20,000 payment under the terms of an exploratory agreement, and pre-settlement occupancy

20

payments amounting to between $10,000 and $15,000 per month for use of only the ground floor of the property.

115. Mr. Zuver seeks declaratory judgment from this Court that the contract between Mr. Zuver and Defendant Sprigg is invalid, unenforceable, and/or void or voidable because it is unconscionable.

116. Mr. Zuver has also suffered substantial financial loss and emotional pain and suffering and is entitled to compensatory and statutory damages.

## COUNT II – VIOLATIONS OF DCCPPA § 28-3904(e-f)
### (Misrepresentation or Omission)

117. Plaintiff repeats the allegations of the preceding paragraphs as if fully set forth herein.

118. Plaintiff brings this Count against Defendant pursuant to Section 28-3905(k)(1)(A) of the DCCPPA, which provides that "[a] consumer may bring an action seeking relief from the use of a trade practice in violation of a law of the District."

119. Defendant Sprigg's acts of using his superior real estate knowledge in brokering a deal for a pre-settlement occupancy and sale of 2110 R to Mr. Zuver constitute trade practices that are regulated by the DCCPPA.

120. Mr. Zuver is a "consumer" within the meaning of D.C. Code § 28-3901(a)(2) because he is a person that does and would purchase or lease a consumer good as a buyer of real estate that he intended to use as his personal residence.

121. Defendant Sprigg is a "merchant" within the meaning of D.C. Code § 28-3901(a)(3) because he is a person who in the ordinary course of business does and would sell, lease or broker a consumer good as a licensed real estate broker.

122.    The sale of 2110 R constitutes "goods and services" within the meaning of D.C. Code § 28-3901(a)(7), which expressly includes real estate transactions.

123.    Defendant Sprigg violated D.C. Code § 28-3904(e-f) in making the following misrepresentations or omissions:

a.      Misrepresenting that he would credit the payments made under the various contracts upon settlement of the property while setting settlement dates that he knew Mr. Zuver could not meet.

b.      Misrepresenting that releases of the various contracts, which he knew would cause a forfeiture of all payments made under the contract, were extensions or merely needed to enter into new contracts.

c.      Misrepresenting that the contract terms were standard or boilerplate and misrepresenting other facts about the real estate industry.

d.      Misrepresenting that Mr. Zuver's check for the earnest money deposit would not be cashed unless and until the purchase of 2110 R was finalized.

e.      Omitting that the releases would result in a forfeiture of all payments made under the various contracts.

f.      Failing to disclose the nature of his relationship with the escrow agent.

124.    Defendant Sprigg's violations of the DCCPPA were intentional, willful, and wanton.

125.    Mr. Zuver reasonably relied on Defendant Sprigg's misrepresentations, omissions, and superior real estate knowledge and has suffered substantial financial loss and emotional pain and suffering and is entitled to compensatory and statutory damages.

## COUNT III – UNJUST ENRICHMENT
### (Undue Influence)

126.    Plaintiff repeats the allegations of the preceding paragraphs as if fully set forth herein.

127.    Defendant Sprigg received a wrongful benefit at the expense of Mr. Zuver by using his superior bargaining power to make or enforce unconscionable terms or provisions in the contracts related to the sale of 2110 R, including but not limited to, excessive deposits and pre-settlement occupancy payments.

128.    The sales contracts and releases that Defendant Sprigg used to carry out his scheme are invalid, voidable, void, and/or unenforceable  because Defendant Sprigg exerted undue influence over Mr. Zuver by using his relationship as Mr. Zuver's trusted neighbor and superior real estate knowledge in negotiating and effectuating the real estate transaction.

129.    Defendant Sprigg had garnered a relationship of confidence and trust with Mr. Zuver as his neighbor for over 17 years and as an experienced and licensed real estate broker. Defendant Sprigg used his status as an experienced real estate broker and fraudulently represented himself as someone who was trying to help Mr. Zuver with his uncertain housing dilemma in gaining Mr. Zuver's trust that Defendant Sprigg would not take advantage of his predicament.

130.    Prior to and at the times complained of herein, Mr. Zuver was elderly and susceptible to undue influence.  Defendant Sprigg gained a grossly oppressive and unfair advantage over Mr. Zuver's mental and emotional state, established a confidential relationship with Mr. Zuver, and isolated him from his now fiancée for the purpose of carrying out his financial exploitation of Mr. Zuver.

131.    At the times complained of herein, Mr. Zuver was under the continued influence of Defendant Sprigg to such an extent that the documents executed and actions taken were not freely and voluntarily ratified by Mr. Zuver, but were procured by Defendant Sprigg's acts and pressure on Mr. Zuver amounting to undue influence.

132.    Defendant Sprigg accepted and benefitted from these excessive payments and has even acknowledged such to Mr. Zuver and others.

133.    Mr. Zuver seeks declaratory judgment from this Court that the contract between Mr. Zuver and Defendant Sprigg is invalid, unenforceable, and/or void or voidable due to Defendant Sprigg's undue influence over Mr. Zuver and restitution for the wrongful benefit Defendant Sprigg gained in this transaction.

## COUNT IV – UNJUST ENRICHMENT
### (Unconscionability)

134.    Plaintiff repeats the allegations of the preceding paragraphs as if fully set forth herein.

135.    Defendant Sprigg received a wrongful benefit at the expense of Mr. Zuver by using his superior bargaining power to make or enforce unconscionable terms or provisions in the contracts related to the sale of 2110 R, including but not limited to, excessive deposits and pre-settlement occupancy payments.

136.    Mr. Zuver is an elderly man on a fixed income, and amid financial difficulties and the loss of his home, he sought to purchase a new house so he could remain in the same neighborhood where he has lived for most of his life.

137.    Defendant Sprigg, a licensed real estate broker, took advantage of Mr. Zuver and induced him to enter into agreements containing unconscionable and excessive terms.

138.    The terms of the agreements are substantively unfair and unreasonably favor Defendant Sprigg.  The terms of the transaction included a $210,000 earnest money deposit, a $20,000 payment under the terms of an exploratory agreement, and pre-settlement occupancy payments amounting to between $10,000 and $15,000 per month for use of only the ground floor of the house.

139.    Defendant Sprigg accepted and knew that he wrongfully received these excessive payments and has even acknowledged such to Mr. Zuver and others.

140.    Mr. Zuver seeks declaratory judgment from this Court that the contract between Mr. Zuver and Defendant Sprigg is invalid, unenforceable, and/or void or voidable due to Defendant Sprigg's inclusion of unconscionable terms in the contracts and restitution for the wrongful benefit Defendant Sprigg gained in this transaction.

### COUNT V – UNJUST ENRICHMENT
**(Liquidated Damages Clause Amounting to an Unenforceable Penalty)**

141.    Defendant Sprigg received a wrongful benefit at the expense of Mr. Zuver by using his superior bargaining power to make or enforce unconscionable terms or provisions in the contracts related to the sale of 2110 R, including but not limited to, excessive deposits and pre-settlement occupancy payments.

142.    The liquidated damages clauses in the real estate contracts amount to unlawful penalties.  The 210,000 deposit amount was not calculated based on a reasonable estimation of anticipated or actual harm caused by a breach of the contract to purchase 2110 R, and the deposit amount is far higher than a reasonable forecast for damages flowing from a potential breach of contract.

143.    In addition, Pre-settlement Occupancy No. 1 contained terms increasing monthly payments for the ground floor of 2110 R from $10,000 to $12,000 if settlement of the property

did not occur by December 31, 2014.  This increase was not calculated based on a reasonable estimation of anticipated or actual harm caused by a breach of the contract to purchase 2110 R, and the increase is far higher than a reasonable forecast for damages flowing from a potential breach of contract.

144.    Defendant Sprigg accepted and benefited from Mr. Zuver's excessive payments and has even acknowledged such to Mr. Zuver and others.

145.    Mr. Zuver seeks declaratory judgment from this Court that the liquidated damages clauses in the contracts between Mr. Zuver and Defendant Sprigg are invalid, unenforceable, and/or void or voidable as an unenforceable penalty and restitution for the wrongful benefit Defendant Sprigg gained in this transaction.

## **COUNT VI – FRAUD**

146.    Plaintiff repeats the allegations of the preceding paragraphs as if fully set forth herein.

147.    Defendant Sprigg maliciously, intentionally, and willfully misrepresented and or knowingly omitted material facts to deceive Mr. Zuver, an elder, into entering an unconscionable real estate transaction to financially exploit him.  The misrepresentations or omissions include, but are not limited to the misrepresentations and omissions set forth in Count II.

148.    As a licensed real estate broker, Defendant Sprigg is obligated to act honestly with buyers and sellers pursuant to D.C. Code § 42-1703.

149.    Defendant Sprigg made these misrepresentations or omissions around the dates of each sales contract and subsequent release thereof throughout the duration of the real estate transaction.

150.    Mr. Zuver reasonably relied on Defendant Sprigg's misrepresentations or omissions in making payments in the real estate transaction that he was lead to believe would be credited towards the purchase of 2110 R.

151.    Mr. Zuver has suffered substantial financial loss and emotional pain and suffering as a result of Defendant Sprigg's fraud.

## COUNT VII – NEGLIGENT MISREPRESENATION

152.    Plaintiff repeats the allegations of the preceding paragraphs as if fully set forth herein.

153.    Even if Defendant Sprigg did not act maliciously, intentionally, or willfully, he negligently made the false statements and misleading omissions set forth in Count II.

154.    As a licensed real estate broker, Defendant Sprigg is obligated to act honestly with buyers and sellers pursuant to D.C. Code § 42-1703.

155.    Defendant Sprigg made these misrepresentations or omissions around the dates of each sales contract and subsequent release thereof throughout the duration of the real estate transaction.

156.    Mr. Zuver reasonably relied on Defendant Sprigg's misrepresentations or omissions in making payments in the real estate transaction that he was lead to believe would be credited towards the purchase of 2110 R.

157.    Mr. Zuver has suffered substantial financial loss and emotional pain and suffering as a result of Defendant Sprigg's negligent misrepresentation.

## COUNT VIII – BREACH OF FIDUCIARY DUTY

158.    Plaintiff repeats the allegations of the preceding paragraphs as if fully set forth herein.

159.    Defendant Sprigg had a fiduciary duty because he had a special relationship of trust with Mr. Zuver.

160.    Defendant Sprigg was Plaintiff's neighbor and had a friendly relationship with Plaintiff.  As a neighbor and real estate broker, Defendant Sprigg knew that Plaintiff was in urgent need of a new home.  There was a relationship of dependence and influence between Plaintiff and Defendant such that Defendant Sprigg had a fiduciary duty to Plaintiff to act with the utmost good faith, honesty and loyalty toward Plaintiff.

161.    Defendant Sprigg breached his fiduciary duties by intentionally using this relationship of trust and position as a real estate broker to take advantage of Mr. Zuver.

162.    Mr. Zuver has suffered substantial financial loss and emotional pain and suffering as a result of Defendant Sprigg's breaches of his fiduciary duties.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

A.    Awarding compensatory damages, restitution, unjust enrichment, or just compensation in excess of $450,000 in favor of Mr. Zuver against Defendant Sprigg for the damages sustained as a result of the wrongful conduct alleged and as will be established through discovery and/or at trial, together with interest thereon;

B.    Awarding treble damages, punitive damages, attorneys' fees, and costs in favor of Mr. Zuver against Defendant Sprigg for the damages sustained in violation of the DCCPPA as alleged herein, pursuant to D.C. Code Ann. § 28-3905(k)(2);

C.    Granting a declaration that the real estate contracts at issue are invalid, unenforceable, and/or void or voidable because the contracts contain an invalid liquidated damages provision, are unconscionable and/or are the result of undue influence.

D.    Imposing a constructive trust as appropriate;

E.      Rescinding the contract and granting restitution or recessionary damages to Mr.

Zuver; and

F.      Such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury.

Respectfully Submitted,


/s/ Michael J. Baratz
Michael J. Baratz
D.C. Bar No. 480607
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC 20036
202.429.6468
mbaratz@steptoe.com