# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WERTH MARC V. ZUVER,

        *Plaintiff*,

    v.

GREGORY SPRIGG,

        *Defendant*.

Civil Action No. 16-2505 (DLF)

**UNDER SEAL**

## <u>MEMORANDUM OPINION</u>

After defaulting on a real estate purchase, Werth Marc V. Zuver sued the seller, Gregory Sprigg.  After Sprigg moved to dismiss Zuver's complaint, Dkt. 7, the previously assigned judge allowed limited discovery to facilitate mediation, Minute Order of July 31, 2017, but the parties' attempt at mediation failed.  Because discovery revealed significant inconsistencies between the complaint and Zuver's own account, Sprigg moved for Rule 11 sanctions.  Dkt. 24.  In responding to the Rule 11 motion, Zuver's pro bono counsel breached the confidentiality provision of the parties' mediation agreement by disclosing to the Court that Sprigg had rejected a proposal from the mediator at the end of mediation.  Dkt. 33 at 8, 45.

For the reasons that follow, the Court will dismiss five of the complaint's eight counts for failure to state a claim, grant summary judgment to Sprigg with respect to the other three counts, deny the Rule 11 motion, and require Zuver's counsel to reimburse Sprigg for fees incurred as a result of the breach of the mediation agreement.

## I. BACKGROUND

For decades, Zuver ran a non-profit art company named Fondo del Sol and operated a home-based art center out of his residence in the Dupont Circle neighborhood of Washington, D.C.  Compl. ¶¶ 2, 16, 19–20, Dkt. 1.  Zuver rented the home for several decades until 2000, when Fondo purchased it.  *Id.* ¶¶ 18, 23.  In 2010, Zuver, more than eighty years old, was diagnosed with colon cancer.  *Id.* ¶ 25.  Thereafter, Fondo began to experience financial difficulty and sold the Dupont Circle property in September 2012.  *Id.* ¶ 26.  The purchase agreement allowed Zuver to remain in the home for one year after the sale but required him to find a new place to live (and to store Fondo's art collection) by September 2013.  *Id.* ¶ 29.

Zuver accordingly approached Sprigg, a next-door neighbor who happened to be a real estate broker, about renting Sprigg's property.  *Id.* ¶¶ 22, 34.  Sprigg, who had lived at the property since 1997, planned to move to Virginia and was open to selling—but not renting—his property to Zuver.  *Id.* ¶¶ 4, 22, 34.  In fall 2013, Zuver and Sprigg entered into an agreement in which Zuver paid Sprigg $20,000 in exchange for Sprigg keeping portions of his property vacant and off the market from November 1 through December 31 while the parties discussed the potential purchase.  *Id.* ¶ 38.  The agreement allowed Zuver to credit the $20,000 to the prospective purchase.  *Id.* ¶ 40.

In late December 2013, Zuver and Sprigg entered into a sales contract for the purchase of the property at $1,845,000 (a $1,200,000 down payment plus $645,000 in seller-provided financing with a fifteen-year mortgage) with a settlement date of April 30, 2014.  *Id.* ¶¶ 49–50. The contract required Zuver to deliver a $200,000 earnest-money deposit to an escrow account; the deposit was credited to the purchase price.  *Id.* ¶ 51; First Sales Contract at 3, Dkt. 1-2.  The contract also included a pre-settlement occupancy agreement that allowed Zuver to occupy the

ground floor of the property for the first four months of 2014 in exchange for a nonrefundable $40,000 lump-sum payment.  Compl. ¶ 56.  The pre-settlement occupancy agreement disclaimed any tenancy relationship, stated that Sprigg would credit Zuver $50,000 at settlement, and noted that the per-month payment would increase to $12,000 if settlement did not occur by April 30 and Zuver failed to vacate the property.  *Id.* ¶¶ 56–57.  Sprigg later agreed to extend settlement and the $10,000 monthly rate to September 21, 2014.  *Id.* ¶ 60.

But Zuver failed to raise the funds necessary to complete the purchase.  *Id.* ¶ 63.  On September 22, 2014, Zuver and Sprigg signed a release of the sales contract that nullified the contract, released both parties from liability in connection with the sales contract, authorized Sprigg to sell the property to another party, and directed the escrow agent to disburse the $200,000 earnest-money deposit to Sprigg.  First Release Agreement, Dkt. 1-3.

In October 2014, Zuver and Sprigg signed a second sales contract for purchase of the property with a settlement date of December 31, 2014.  Compl. ¶ 72.  The sales price was $1,600,000 ($245,000 less than the sales price in the first contract), with a $1,000,000 down payment and $600,000 in seller-provided financing.  *Id.* ¶ 74.  The second sales contract required Zuver to deliver $5,000 to the escrow account.  *Id.* ¶ 75.  It also included a pre-settlement occupancy agreement with the same terms as the first except that it required Zuver to pay a lump sum of $30,000 for October, November, and December, omitted the clause crediting Zuver $50,000 toward settlement, and increased the monthly payment to $12,000 if settlement did not occur by December 31, 2014 and Zuver failed to vacate.  *Id.* ¶¶ 76–77.  In early January 2015, the parties extended the settlement date through the month in exchange for a $10,000 payment from Zuver to Sprigg.  *Id.* ¶ 79.

Zuver again failed to raise sufficient funds, and on January 30, 2015, the parties signed another release agreement.  The agreement nullified the second sales contract, released both parties from liability relating to the second sales contract, authorized Sprigg to sell the property to another party, and directed the escrow agent to disburse the $5,000 deposit to Sprigg.  *Id.* ¶¶ 80–81; Second Release Agreement, Dkt. 1-5.

On the same day, Zuver and Sprigg signed a third sales contract with a settlement date of September 30, 2015 and a sales price of $1,700,000 with a $1,000,000 down payment and $700,000 in seller-provided financing.  Compl. ¶ 82–83.  The third sales contract required Zuver to deliver another $5,000 deposit to the escrow account.  *Id.* ¶ 84.  The pre-settlement occupancy agreement this time required Zuver to pay $20,000 for February 2015 and $15,000 per month thereafter with $5,000 per month credited to Zuver upon settlement.  *Id.* ¶¶ 85–86.

Zuver again failed to close, and the parties signed a third release agreement on February 26, 2016.  Third Release Agreement, Dkt. 7-3.[1]  Like the others, the agreement nullified the third sales contract, released both parties from liability relating to the third sales contract, and authorized Sprigg to sell the property to another party.  Unlike the others, the release directed the escrow agent to disburse the $5,000 deposit to Zuver instead of Sprigg.  *Id.*  The parties signed another agreement that allowed Zuver to store the artwork at the property during the month of March for $10,000.  Compl. ¶ 100.  In early April, Sprigg demanded that Zuver vacate the property entirely.  *Id.* ¶ 101.

Zuver sued Sprigg in this Court in December 2016.  Zuver alleges that Sprigg took advantage of his old age and vulnerability in several ways:

---

[1] The third release agreement is not attached to the complaint but can be considered on a motion to dismiss because it is integral to the complaint.  *See Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004); Compl. ¶¶ 93, 95.

- Sprigg misled Zuver into believing that the initial $20,000 paid for keeping the property available for two months while the parties discussed the prospective purchase would be credited toward the purchase price as in a rent-to-buy agreement, *id.* ¶ 36;

- Sprigg misrepresented the sales contracts as boilerplate, *id.* ¶ 43;

- Although encouraging Zuver to retain a lawyer, Sprigg also told Zuver that attorneys were unnecessary and would "muck things up," *id.* ¶ 46;

- Sprigg misrepresented the pre-settlement occupancy agreements as similar to rent-to-buy arrangements, *id.* ¶ 54;

- To obtain the first release agreement, Sprigg isolated Zuver by meeting with him alone without Zuver's girlfriend Delfa Castillo, an attorney who had communicated with both Zuver and Sprigg about the purchase, *id.* ¶ 68;

- Sprigg continued to press forward with the property sale despite knowing that Zuver was elderly, did not have the support of family members or lawyers, and did not have sufficient funds to complete the purchase, *id.* ¶¶ 47, 48, 63, 64, 73, 78, 81, 88–89.

Zuver asserts counts of unconscionability, unjust enrichment, fraud, negligent representation, and breach of fiduciary duty. *See id.* ¶¶ 105–162. The complaint seeks $450,000 in damages plus treble damages, punitive damages, attorneys' fees and costs, rescission of the contracts, and other relief. *Id.* at 28–29.

After Sprigg moved to dismiss, the judge previously assigned to this case allowed limited discovery, consisting of document exchanges and depositions of key witnesses, for the purpose of facilitating mediation. Minute Order of July 31, 2017. During Zuver's deposition, he repeatedly denied having seen the complaint before affirming after a break that he had in fact read the complaint. *See* Mem. in Supp. of Mot. for Sanctions at 2–3, Dkt. 24-1. Zuver also undermined the claims of undue influence and breach of fiduciary duty by recounting that he and Sprigg "never had any relationship" before they began negotiating the purchase. *Id.* at 14. Citing these and other incongruities between the complaint and discovery evidence, Sprigg filed a motion for sanctions under Rule 11 of the Federal Rules of Civil Procedure. *See id.* at 1; Fed. R. Civ. P. 11. In its opposition to Sprigg's motion for Rule 11 sanctions, Zuver's counsel

conceded—consistent with Zuver's testimony—that Zuver and Sprigg had no "close personal relationship prior to the signing of the First Sales Contract."  Opp'n to Mot. for Sanctions at 23, Dkt. 33 (emphasis omitted).   Zuver's counsel also revealed that the mediator made a proposal that Sprigg rejected.  *Id.* at 8, 45.  The case was reassigned to the undersigned judge on December 5, 2017.

## II.  LEGAL STANDARDS

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss the complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This standard does not amount to a specific probability requirement, but it does require "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*; *see also Twombly*, 550 U.S. at 557 ("Factual allegations must be enough to raise a right to relief above the speculative level.").  A complaint alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility."  *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

Well-pleaded factual allegations are "entitled to [an] assumption of truth," *id.* at 679, and the court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted).  The assumption of truth does not apply, however, to a "legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at 678

(quotation marks omitted).  An "unadorned, the defendant-unlawfully-harmed-me accusation" is not credited; likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

A court grants summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A "material" fact is one with potential to change the substantive outcome of the litigation.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).

Rule 11 requires attorneys to conduct an "inquiry reasonable under the circumstances" before filing a complaint and to certify, among other things, that the claims and legal arguments are "warranted by existing law or by a nonfrivolous argument" for changing the caselaw, and that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b).  Rule 11 also allows the court to "impose an appropriate sanction on any attorney, law firm, or party that violated the rule."  Fed. R. Civ. P. 11(c)(1).  "[T]he central purpose of Rule 11 is to deter baseless filings in district court."  *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990).  Federal courts also have inherent power to impose sanctions and may "assess attorney's fees when a party has acted in bad faith."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991) (quotation marks omitted).

## III. ANALYSIS

The Court has subject-matter jurisdiction over the suit because the parties have diverse domiciles and the amount in controversy exceeds $75,000.  *See* 28 U.S.C. § 1332.  D.C. law applies.  *See Ideal Elec. Sec. v. Int'l Fid. Ins.*, 129 F.3d 143, 148 (D.C. Cir. 1997).  If "no D.C.

Court of Appeals case . . . directly" addresses an issue, the Court must "reason by analogy from D.C. cases to predict how that court would decide the question." *Earle v. D.C.*, 707 F.3d 299, 310 (D.C. Cir. 2012) (internal quotation marks omitted).

In evaluating a motion to dismiss under Rule 12(b)(6), a court may consider only the complaint itself, documents attached to the complaint, documents incorporated by reference in the complaint, and judicially noticeable materials. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). Rule 12(d), however, allows the court to consider matters outside the pleadings if the court treats the Rule 12(b)(6) motion "as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d); *see also* Fed. R. Civ. P. 56(a). The court also may, a fortiori, convert the motion to dismiss into a motion for summary judgment only with respect to certain counts or issues. *See, e.g.*, *Page v. Mancuso*, 999 F. Supp. 2d 269, 276 (D.D.C. 2013); *Boritz v. United States*, 685 F. Supp. 2d 113, 118 (D.D.C. 2010).

"The decision to convert a motion to dismiss into a motion for summary judgment . . . is committed to the sound discretion of the trial court." *Flynn v. Tiede–Zoeller, Inc.,* 412 F. Supp. 2d 46, 50 (D.D.C. 2006) (citing 5C Wright & Miller, Federal Practice and Procedure § 1366 (3d ed. 2004)). In exercising this discretion, the "reviewing court must assure itself that summary judgment treatment would be fair to both parties." *Tele–Commc'ns of Key West, Inc. v. United States*, 757 F.2d 1330, 1334 (D.C. Cir. 1985). Before a Rule 12(d) conversion, the parties "must be given a reasonable opportunity to present all the material that is pertinent," Fed. R. Civ. P. 12(d), but this requirement has no application when "it is clear that the dispositive facts will remain undisputed and unchanged," *Hollis v. U.S. Dep't of Army*, 856 F.2d 1541, 1544 (D.C. Cir. 1988); *see also Taylor v. FDIC*, 132 F.3d 753, 766 (D.C. Cir. 1997) (concluding that allowing for additional discovery before converting to summary judgment is unnecessary when

additional discovery "will not help" the plaintiff); *Bowe-Connor v. Shinseki*, 845 F. Supp. 2d 77, 86 (D.D.C. 2012) ("A motion may be treated as one for summary judgment even if the parties have not been provided with notice or an opportunity for discovery if they have had a reasonable opportunity to contest the matters outside of the pleadings such that they are not taken by surprise.").

Here, it would be unfair to convert the entire motion to dismiss into a summary-judgment motion on the basis of the parties' limited discovery. Most notably, Zuver has not been given the opportunity to depose Castillo, who played a major role in the negotiations. One matter, however, is firmly settled by Zuver's deposition: Zuver testified that he and Sprigg had no relationship before they began negotiating the purchase. And while Zuver's counsel argued that some of Zuver's other testimony was inaccurate due to fatigue, Opp'n to Mot. for Sanctions at 36, Zuver's counsel corroborated Zuver's account regarding the precontractual relationship, *id.* at 23–24 (not disputing Zuver's statement that he and Sprigg had no precontractual relationship and arguing instead that the undue-influence and fiduciary-relationship claims are based primarily on the parties' interactions while negotiating the purchase). Because both parties have addressed the issue and agree that there was no precontractual relationship, the Court will evaluate the discrete issue of the parties' precontractual relationship under Rule 56. Aside from that, the Court will consider discovery evidence only for purposes of the Rule 11 motion and not when evaluating the motion to dismiss.

### A.     Merits

Zuver asserts the following counts:

- Count I:  Unconscionability under the D.C. Consumer Protection Procedures Act
- Count II:  Misrepresentations and omissions under the D.C. Consumer Protection Procedures Act

- Count III:  Undue influence under the common law
- Count IV:  Unconscionability under the common law
- Count V:  Unenforceable penalty under the common law
- Count VI:  Fraud under the common law
- Count VII:  Negligent misrepresentation under the common law
- Count VIII:  Breach of fiduciary duty under the common law

The three release agreements released Sprigg from "any and all responsibility, liability, claim and/or complaint in connection with" the three sales contracts.  Dkt. 1-3; Dkt. 1-5; Dkt. 7-3.  "A release is a form of contract."  *GLM P'ship v. Hartford Cas. Ins.*, 753 A.2d 995, 998 (D.C. 2000) (quotation marks and internal alteration omitted).  Zuver argues that the release agreements are unenforceable because they are unconscionable and were procured through Sprigg's undue influence.[2]  Both arguments fail, but even without the release agreements, each of the complaint's eight counts fails independently.

To start, the statutory counts (Counts I and II) fail because "[t]he D.C. Court of Appeals has repeatedly concluded that the [D.C. Consumer Protection Procedures Act] was designed to police trade practices arising only out of consumer-merchant relationships."  *Ali v. Tolbert*, 636 F.3d 622, 628 (D.C. Cir. 2011) (internal quotation marks omitted).  The Act defines "merchant" as "a person . . . who in the ordinary course of business does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or services . . . ."  D.C. Code § 28-3901(3).  The parties agree that while Sprigg is a real-estate broker, he did not act as a broker during the attempted sale.  *See* Mem. in Supp. of Mot. to Dismiss at 9–10, Dkt. 7; Opp'n to Mot. to Dismiss at 19–22, Dkt. 10.  Even so, Zuver argues that Sprigg's occupation as a real-estate broker makes

---

[2] Zuver does not argue that he was at any time mentally incapacitated.  *See* Opp'n to Mot. to Dismiss at 17, Dkt. 12.

him a merchant at all times (or at least when selling real estate).  Opp'n to Mot. to Dismiss at 19–22.  Sprigg, on the other hand, argues that he was not a merchant here because he was negotiating the sale of his personal residence and not acting as anyone's broker.  Mem. in Supp. of Mot. to Dismiss at 9–10.

Sprigg has the better argument.  Because Sprigg plainly did not act as anyone's broker during the attempted sale, Zuver's argument must rest on the premise that it is a person's occupational status, not the person's conduct during the relevant transaction, that controls the question whether the person is a merchant.  *See* Opp'n to Mot. to Dismiss at 20 ("[T]he term 'merchant' includes '*all* persons who 'sell'' consumer goods or services." (quoting *Chen v. Bell-Smith*, 768 F. Supp. 2d 121, 142 (D.D.C. 2011))).  Though Zuver tries to limit his argument's reach, his focus on status would logically categorize Sprigg as a merchant even if Sprigg were a jeweler or barber and his occupation had nothing to do with the real-estate transaction.

The D.C. Court of Appeals does not read the Act so expansively.  While the Act does not explicitly distinguish between status and conduct, the D.C. Court of Appeals analyzes whether a purported merchant acted as merchant during the relevant transaction, not whether the purported merchant ordinarily sells consumer products for his or her day job.  In *Carleton v. Winter*, for example, the D.C. Court of Appeals held that a real-estate agent was not a merchant because she had not acted as a merchant with respect to the transaction at issue.  901 A.2d 174, 179 (D.C. 2006).  If occupational status mattered, the court would have categorized the real-estate agent as a merchant.  Instead, the court focused on the real-estate agent's conduct in relation to the transaction at issue.  It did not matter that the real-estate agent sold consumer services in other contexts.  *See also, e.g.*, *Adam A. Weschler & Son v. Klank*, 561 A.2d 1003, 1004 (D.C. 1989) (analyzing whether the defendant acted as a merchant during "the transaction").  Because Zuver

does not allege that Sprigg acted as a real-estate broker during his interactions with Zuver, the Act does not apply.  That eliminates Counts I and II.

Next, undue influence—a basis for Zuver's assertion of unenforceability and the basis for Count III of the complaint—exists when "the will of one party to a contract is overcome by the improper acts of another party."  *Goldman v. Bequai*, 19 F.3d 666, 675 (D.C. Cir. 1994) (applying D.C. law).  More specifically, undue influence occurs when (1) "a party in whom another reposes confidence" (2) "misuses that confidence to gain his own advantage" (3) "while the other has been made to feel that the party in question will not act against his welfare."  *Id.* (quotation marks omitted).  Relevant factors include a plaintiff's "advanced age, mental condition, poor health, as well as the consideration a defendant gave for the benefit conferred by [the] plaintiff."  *Id.*

The complaint establishes that Zuver was elderly, ¶ 1, but is less clear about the other typical marks of vulnerability.  The complaint asserts that Zuver suffered from "declining health," ¶ 5, but does not specify any health problems existing when the parties contracted. Zuver was diagnosed with colon cancer in 2010, but it is unclear if the cancer or any adverse effect persisted to 2013 when he approached Sprigg about the property.  *See* Compl. ¶ 1 (describing Zuver as a cancer survivor).  On mental condition, the complaint states that Zuver's "ability to protect his own interest and make well-thought-out decisions had waned with his age and lack of personal business savvy," ¶ 30, but offers no specifics to bolster that conclusory assertion.  The portrayal of Zuver as unsophisticated and naive is weakened, moreover, by the fact that Zuver had a graduate degree from Yale, ran a company for several decades, and started a new company in 2014 in the midst of attempting to purchase Sprigg's property.  *See id.* ¶¶ 16, 19; Dkt. 7-4.

Regardless whether Zuver sufficiently alleges that he was in a vulnerable position, he fails to plausibly plead a relationship of confidence between Zuver and Sprigg.  They were neighbors for seventeen years, but it is undisputed that they "never had any relationship" before Zuver approached Sprigg about the property.  *See* Mem. in Supp. of Mot. for Sanctions at 14; Opp'n to Mot. for Sanctions at 23.   Other than being neighbors, the complaint asserts only that Zuver trusted Sprigg "because of his superior real estate knowledge" and "shared values."  ¶ 32. That falls far short of indicating a relationship of confidence:  The fact that a person has real-estate expertise and is ethical does nothing to support an inference that the person will act in the other party's interest when negotiating a real-estate contract.  Moreover, by encouraging Zuver to obtain legal counsel, Sprigg affirmatively suggested to Zuver that he was *not* acting as some sort of fiduciary.  *See* Compl. ¶ 46.  Other than stating that Zuver and Sprigg were neighbors, Sprigg had real-estate expertise, and Zuver and Sprigg seemed to share values, the complaint offers only vague and conclusory assertions for its claim that the parties had a relationship of confidence.  *See* Compl. ¶¶ 129 ("Sprigg had garnered a relationship of confidence and trust with Mr. Zuver . . . ."), 130 ("Sprigg . . . established a confidential relationship with Mr. Zuver."); *Twombly*, 550 U.S. at 570 (stating that a plaintiff must plead "more than an unadorned, the-defendant-unlawfully-harmed-me accusation").

Even if the parties did have a relationship of confidence, the complaint does not sufficiently allege that Sprigg misused it to his advantage.  It was Zuver who approached Sprigg about the property.  Compl. ¶ 34.  And while Zuver alleges that Sprigg misrepresented a slew of facts during negotiations, none of these allegations has merit.  First, Sprigg allegedly represented on multiple occasions that the parties' arrangement would function like a rent-to-buy agreement in which rent payments are credited toward the purchase price, but the complaint contains

13

nothing to suggest that this representation was false or misleading.  Because Zuver failed to raise

the funds to complete the purchase whether his payments were credited or not, it is speculative to

inquire whether the payments ultimately would have been credited toward the purchase price.

The complaint does not suggest that the alleged rent-to-buy representations disadvantaged Zuver.

Second, the complaint alleges that Sprigg represented the contracts as boilerplate, but Zuver does

not dispute that most of each contract *is* boilerplate.  Only the last page of each contract (a

general addendum) contains unique terms, and the fact that unique terms are included in the

general addendum is readily apparent from a quick look at the contract.  *See, e.g.*, First Sales

Contract; *Curtis v. Gordon*, 980 A.2d 1238, 1244 (D.C. 2009) ("Generally, one who assents to a

writing is presumed to know its contents." (quotation marks omitted)).  Third, the complaint

asserts that Sprigg misrepresented the release agreements as mere extensions of their respective

underlying contracts.  That assertion too is defeated by the release agreements themselves, which

plainly nullify the underlying contracts and do not extend them.  *See, e.g.*, First Release

Agreement.  This is a primary purpose of any release agreement, as the name indicates.  Fourth,

the complaint asserts that Sprigg misrepresented that the earnest-money deposits would not be

cashed unless the property sale was completed.  Again, this assertion is barred by the plain

language of the contracts; the first two release agreements explicitly directed the escrow agent to

disburse the earnest-money funds to Sprigg.  *See, e.g.*, First Release Agreement; *Curtis*, 980

A.2d at 1244 ("[O]ne who signs a contract has a duty to read it and is obligated according to its

terms." (quotation marks omitted)).  A primary point of an earnest-money deposit, moreover, is

to provide security to the seller in the event of buyer default.  It is implausible to suggest that

Zuver reasonably thought that he could default on the purchase yet retain the earnest-money

deposit.  Fifth, the complaint alleges that Sprigg omitted that the releases would result in

forfeiture of the first two earnest-money deposits and the occupancy payments.  But Sprigg was not required to act as Zuver's lawyer, informing him of all negative consequences of the contracts he signed.  Ironically, Zuver's counsel cites the times Sprigg *did* offer friendly advice as evidence of a fiduciary relationship—a textbook illustration of the "damned if you do, damned if you don't" idiom.  Also, the occupancy agreements explicitly stated that the occupancy payments were "non-refundable," *see* Compl. ¶¶ 56, 76, and the first two release agreements explicitly directed the escrow agent to distribute the funds to Sprigg, *see, e.g.*, First Release Agreement.  Sixth, the complaint alleges that Sprigg failed to disclose that he knew the escrow agent who handled the earnest-money deposits.  ¶ 123(f).  But the escrow agent had no discretion over the funds and disbursed them to Sprigg—or to Zuver, in the case of the third release—only after Zuver defaulted.  *See, e.g.*, First Release Agreement.  The relationship, therefore, had no effect.  Finally, the complaint alleges that Sprigg "isolated" Zuver by meeting him alone on several occasions, including when the parties signed the first release agreement.  But the complaint does not support the inference that the one-on-one meetings were insidious.  Castillo may have been absent for these meetings because, as she "informed Defendant Sprigg," she "did not wish to get involved in the negotiations or the transaction."  Compl. ¶ 44.  (The complaint criticizes Sprigg both for emailing Castillo and for not including her; once again, in the eyes of Zuver's counsel, Sprigg is damned either way.)  In any event, the mere fact that Zuver and Sprigg met alone on occasion does not lift the undue-influence claim to the level of plausibility.

Moving on, Count IV fails because common-law unconscionability is "an affirmative defense, not a cause of action."  *Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 555 (D.C. 2016) (rejecting a claim brought by a plaintiff who paid a contractual fee and then sued to recover the money); *see also Johnson v. Long Beach Mortg. Loan Tr. 2001-4*, 451 F. Supp. 2d

16, 36 (D.D.C. 2006).  Regardless, the contracts are not unconscionable.  In the District of

Columbia, "[a] party seeking to avoid a contract because of unconscionability must prove two

elements:  an absence of meaningful choice on the part of one of the parties [*procedural*

*unconscionability*] together with contract terms which are unreasonably favorable to the other

party [*substantive unconscionability*]."  *Curtis*, 980 A.2d at 1244 (internal quotation marks

omitted).  Except in an "egregious situation," "[t]he party invoking unconscionability as a

defense to enforcement of a contractual term must prove both elements."  *Kenyon Ltd. P'ship v.

1372 Kenyon St. Nw. Tenants' Ass'n*, 979 A.2d 1176, 1186 (D.C. 2009) (quotation marks

omitted); *see also Ruiz v. Millennium Square Residential Ass'n*, 156 F. Supp. 3d 176, 180

(D.D.C. 2016) ("[T]here do not appear to be any reported D.C. cases finding such an 'egregious'

scenario.").

　　　　Generally, a contract is unreasonably favorable to one party and thus substantively

unconscionable when it is "extreme" and "affronts the sense of decency."  *Urban Investments,

Inc. v. Branham*, 464 A.2d 93, 100 (D.C. 1983) (quotation marks omitted).  Here, the release

agreements allowed Sprigg to keep two categories of funds:  (1) those Zuver paid to keep the

property off the market and occupy it, and (2) Zuver's first two earnest-money deposits.  The

first earnest-money deposit of $200,000 was 10.8 percent of the purchase price, while the second

earnest-money deposit of $5,000 was 0.3 percent of the purchase price.  *See* Compl. ¶¶ 74–75;

Dkt. 1-4 at 2.  Both amounts reasonably reflected default risk.  There is no question that Sprigg

relied on Zuver's legally binding promise that he would purchase the property.  For one, Sprigg

kept the property off the market for several years when he wanted to sell it.  *See* Compl. ¶ 102.

He ultimately sold the property for $120,000 less than Zuver's purchase price in nominal terms

(the loss was presumably even greater in real terms).  *Id.*  Sprigg also invested a good deal of

time endeavoring to complete Zuver's purchase.  *See generally* Compl.  The $205,000

reasonably compensated Sprigg for Zuver's failure to fulfill his end of the deal.

The exploratory-period payment, which was $10,000 per month, and the occupancy

payments, which started at $10,000 per month and later increased to $15,000, are reasonable as

well.  While the portion of the property Zuver previously occupied rented for only $3,510 per

month at the time the complaint was filed, in whole the property rented for $13,890 per month.

Compl. ¶ 103.  And most importantly, Sprigg wanted to sell his property—not rent it.  The rent

versus sell decision carries a series of tradeoffs that may be influenced by a property owner's

idiosyncratic preferences.  For whatever reason, Sprigg preferred sale.  "Pre-settlement

occupancy agreements," moreover, "are uncommon because they carry substantial risks for both

sellers and buyers."  Compl. ¶ 52.  The occupancy payments, therefore, were not simply rental

payments; they included a preference premium and a risk premium, and they represented a short-

term accommodation of Zuver's need for immediate housing.  It was Zuver's defaults that

extended the accommodation, and the increase of occupancy payments to $15,000 per month

reasonably compensated Sprigg for the growing inconvenience he experienced as a result of not

being able to sell his property.  A comparison of the occupancy payments to the property's

current rental income is thus inapt.

Count V is a claim that the earnest-money deposits amounted to unenforceable penalties.

An earnest-money clause acts as a liquidated-damages clause—it provides funds to the seller in

the event the buyer defaults.  "It is well-settled that parties to a contract may agree in advance to

a sum certain to be forfeited as liquidated damages for breach of contract.  Such a bargained-for

liquidated-damages clause is valid unless it is found to constitute a penalty."  *S. Brooke Purll,*

*Inc. v. Vailes*, 850 A.2d 1135, 1138 (D.C. 2004) (quotation marks and alteration omitted).  A

liquidated-damages clause constitutes an unenforceable penalty only if it is "demonstrably unreasonable." *Id.* As discussed, the earnest-money provisions here were not.

Counts VI and VII are claims of fraud and negligent misrepresentation. "The essential elements of common law fraud are: (1) a false representation (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation." *Va. Acad. of Clinical Psychologists v. Grp. Hospitalization & Med. Servs.*, 878 A.2d 1226, 1233 (D.C. 2005) (quotation marks omitted). When a transaction is arm's length—and it is undisputed that Zuver and Sprigg had no relationship at the time they began their transaction—the plaintiff must also show that "reliance on the alleged material misrepresentations was reasonable." *Washington Inv. Partners of Del. v. Sec. House, K.S.C.C.*, 28 A.3d 566, 576 (D.C. 2011) (quotation marks, emphasis, and alteration omitted). To state a claim for negligent misrepresentation, a plaintiff must allege "(1) that the defendant 'made a false statement or omitted a fact that he had a duty to disclose,' (2) that the statement or omission 'involved a material issue,' and (3) that the plaintiff 'reasonably relied upon the false statement or omission to his detriment.'" *Intelect Corp. v. Cellco P'ship*, 160 F. Supp. 3d 157, 186 (D.D.C. 2016) (quoting *Redmond v. State Farm Ins. Co.*, 728 A.2d 1202, 1207 (D.C. 1999)). Both counts fail because, as discussed, the complaint fails to sufficiently allege that Sprigg misrepresented or omitted a material fact that Zuver could have reasonably relied upon.

That leaves Count VIII, which alleges a breach of a fiduciary duty based on Sprigg and Zuver's relationship as neighbors. *See* Compl. ¶ 160; *Jenkins v. Strauss*, 931 A.2d 1026, 1033 (D.C. 2007) ("A 'fiduciary relationship arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.'" (quoting

18

Restatement (Third) of Agency § 1.01 (2006))).  It is undisputed that Zuver and Sprigg "never had any relationship" as neighbors—their eventual relationship was based on the negotiation of the sale itself.  *See* Mem. in Supp. of Mot. for Sanctions at 14; Opp'n to Mot. for Sanctions at 23. The complaint also suggests that Sprigg's occupation as a real-estate broker conferred fiduciary obligation, ¶ 160, but the complaint does not allege that Sprigg acted as Zuver's broker, so the suggestion carries no force.  Thus, Count VIII loses too.

Zuver is "obligated according to [the contractual] terms" even if he "was not represented by a lawyer" and even if he "did not read . . . or understand" the contracts.  *Curtis*, 980 A.2d at 1244 (quotation marks omitted).  The complaint must be rejected in its entirety.

**B.    Sanctions**

**1. Rule 11 Motion**

In his motion for Rule 11 sanctions, Sprigg argues that Zuver's counsel filed a frivolous complaint;[3] Zuver's counsel counters that Sprigg's Rule 11 motion is itself frivolous.  Sprigg's arguments in support of his Rule 11 motion fall into two main categories.  First, Sprigg highlights inconsistencies between the allegations in the complaint and Zuver's own account. Second, Sprigg contends that several of the complaint's legal claims are so far afield that they are frivolous.

Some of the inconsistencies between the complaint and Zuver's testimony might be due in part to confusion on the part of Zuver.  When presented with the complaint, Zuver initially asserted that he had "not seen [the complaint]."  Mem. in Supp. of Mot. for Sanctions at 2. When pressed, he repeated that "I've never seen it."  *Id.*  When his lawyer informed him that the

---

[3] Consistent with Rule 11(c)(2), Sprigg served the motion more than 21 days before filing it with the Court to give Zuver the opportunity to withdraw the complaint.  *See* Fed. R. Civ. P. 11(c)(2).

document was the complaint, Zuver responded: "Right.  This is the complaint.  I've not seen it before."  *Id.*  Ultimately, Zuver testified after a break that he had in fact seen the complaint.  *Id.* at 3.

Additionally, while the complaint asserted damages for funds that came from both Zuver's personal bank account and his nonprofits' accounts, *see* Compl. at 28; Dkt. 23-5, Zuver testified that he only sought damages for the money that came from his personal account, Dkt. 32-1 at 71, 25:17–18 ("I'm not suing for [the nonprofit]."); Dkt. 32-1 at 71, 28:6–7 ("[The nonprofit] wanted to help buy the building."); *id.* at 519, 135:5–8 ("[T]his has nothing to do with [the nonprofit]"); *id.* at 521, 353:3–22; *id.* at 65, 178:5–7 ("[The nonprofit] wanted to have some presence in the second floor.  That's what they put their money up for.").  Zuver's counsel argues that it had an "ethical responsibility to pursue [Zuver's] legal rights even if he does not personally fully understand them" and that "Mr. Zuver's legal right to the [full amount] is clear." Opp'n to Mot. for Sanctions at 37.  *But see* D.C. Rules of Prof'l Conduct 1.2(a) ("A lawyer shall abide by a client's decisions concerning the objectives of representation.").

The most glaring discrepancies between the complaint and the facts that came to light during discovery relate to the complaint's description of the parties' relationship and of Sprigg's alleged attempt to discourage Zuver from obtaining legal advice.  As to the parties' relationship, the complaint alleges that Sprigg "had garnered a relationship of confidence and trust with Mr. Zuver as his neighbor for over 17 years."  Compl. ¶ 129; *see also id.* ¶ 4 ("Between 1996 and 2013, Mr. Sprigg and Mr. Zuver developed a friendly relationship."); *id.* ¶ 22 ("Mr. Zuver and Defendant Sprigg developed a friendship over the years."); *id.* ¶ 160 ("Defendant Sprigg was Plaintiff's neighbor and had a friendly relationship with Plaintiff.").  Zuver testified, however, that he "never had any relationship [with Sprigg]."  Dkt. 32-1 at 525–26, 72:16–73:20.  In its

Rule 11 opposition brief, Zuver's counsel walked back the complaint's relationship-of-confidence assertion by arguing that it is based "primarily on the conduct and relationship developed *during* the transaction" rather than "*prior* to the signing of the First Sales Contract"—that is, the relationship of confidence was not based on the seventeen years of being neighbors after all.  Opp'n to Mot. for Sanctions at 23–24.

     As to the relationship that developed during the attempted sale, it is true, as emails produced in discovery reveal, that Sprigg appeared to demonstrate a great deal of patience and empathy in his interactions with Zuver and Castillo.  *See, e.g.*, Dkt. 32-1 at 100 (Sprigg emailing Castillo in December 2013:  "[Zuver] should plan to set aside at least an hour and possibly as much as two hours to leisurely go over the entire contract. I know he doesn't like to sit still and give papers a good look but this is important for him; maybe you might want to be there, too?"); *id.* at 100–109; *id.* at 151 (Sprigg emailing Castillo on December 27, 2013: "[I]f [Zuver] wants to go forward that's great; if he doesn't, that's fine too.  But we need to wrap it up!"); *id.* at 187 (Sprigg emailing Castillo in July 2014:  "Please remind [Zuver] that I'm committed to selling the house as soon as possible. . . . We've been working on this since November 2013 when he first approached me to buy the house and I really must move on with my life.  I'm missing a number of opportunities while we wait this out."); *id.* at 213–214 (Sprigg inquiring about Zuver's fundraising efforts in August 2014 "to get a firm grasp on exactly where we are" and Castillo responding that "[e]verything you say is totally reasonable"); *id.* at 227; *id.* at 237 (Castillo emailing Sprigg in August 2014 that "I understand your frustration and I know that by accommodating [Zuver], you believe we are showing promise" and Sprigg responding that "there's no animus or frustration; it's simply time to be finished" because Zuver "initially approached me about selling last November; we've been under contract since December 2013");

*id.* at 276–277; *id.* at 284; *id.* at 417; *id.* at 424 (Sprigg emailing Castillo in August 2015: "As always—from the very beginning nearly two years ago—I would love for [Zuver] to have the space.  But I need to keep options open and need as much notice as possible."); *id.* at 441; *id.* at 467; *id.* at 471 (Castillo emailing Sprigg in October 2015: "Please work with us.  This museum is critically needed by so many cultural groups.  People across the country WANT it and are willing to HELP us get it.  Please don't lose confidence or heart."); Opp'n to Mot. for Sanctions at 25–27.  But it is a far stretch to interpret Sprigg's acts of apparent kindness and decency as evidence of a relationship of confidence or fiduciary obligation.

With respect to legal advice, the complaint alleges that Zuver "had not had an attorney review the contract on the eve of signing the first contract," ¶ 47, and that Sprigg "only gave lip service to written encouragements for Mr. Zuver to have attorney review of the agreements," *id.* ¶ 46.  Zuver testified, however, that an attorney "took a very quick look and said if [Zuver] really wanted the building, then [he] should just accept [the first sales contract] as it is."  Dkt. 32-1 at 111, 173:2–8.  More importantly, discovery revealed that far from attempting to isolate Zuver from his attorney, Sprigg *repeatedly* pushed Zuver toward legal counsel.  *See, e.g.*, Dkt. 32-1 at 69 (Sprigg emailing Castillo on December 12, 2013 that he "wanted to check in to see if [Zuver] has reviewed the contract with the attorney" and Castillo replying that "I will remind him to call the attorney and I will continue to remind him so that it gets done"); *id.* at 75 (Sprigg emailing Castillo on December 13 that "[Zuver] said he'd be meeting with the attorney this week" and requesting that she "please let me know if he has met with the attorney or whether he has a firmly scheduled appointment to do so" and Castillo assuring Sprigg that "I stood over [Zuver] until he dialed the attorney and know he either left a message or spoke to her personally"); *id.* at 79 (Sprigg emailing Castillo on December 14 that "it's disconcerting that he's repeatedly said

since early October that he would meet with the attorney and has yet to do so"); *id.* at 84
(Castillo emailing Sprigg on December 17 that Zuver "is meeting with his museum's attorney
tomorrow" and Sprigg responding "That's great news"); *id.* at 100 (Castillo emailing Sprigg on
December 26:  "I'm not a real estate attorney . . . , so I don't like taking responsibility for
advising [Zuver].  He has [the attorney referenced in previous emails] for that."); *id.* at 243
(Castillo asking Sprigg on August 28, 2014 if they can wait to discuss settlement until she and
Zuver speak with their attorney and Sprigg responding:  "Of course it's fine to talk with your real
estate attorney.  As you know, from the very beginning–actually–even before the beginning–I
insisted that [Zuver] speak with the attorney before entering into the contract"); *id.* at 274
(Sprigg emailing Castillo on September 24, 2014 that "I ran into [Zuver] out front today and
mentioned when you send the contract to the attorney for review, you should mention to her that
the original Seller Disclosure remains unchanged"); *id.* at 284 (Sprigg emailing Castillo on
October 4, 2014 that "I'm confid[ent] your attorney will find the proposed contract very
[straightforward] and advantageous to [Zuver]"); *id.* at 523, 310:1–7 (Zuver testifying that
Sprigg said "that he wanted me to get a lawyer" before signing the first contract).  Zuver's
counsel responds only that a quick look does not constitute attorney review and that Zuver's
deposition answers "were not as accurate as possible . . . as a result of his fatigue and feeling of
being overwhelmed with the deposition process."  Opp'n to Mot. for Sanctions at 31, 36.

Sprigg further argues in support of his Rule 11 motion that several of the complaint's
legal claims are frivolous.  For example, Sprigg argues that Zuver's counsel lacked a good-faith
basis for alleging that Zuver was a consumer under the D.C. Consumer Protection Procedures
Act.  Zuver testified in his deposition that he had attempted to purchase the property "for a
nonprofit," Dkt. 32-1 at 499, 307:19–21, that "[t]he purchaser, in my opinion, . . . would be [the

nonprofit]," *id.* at 497, 291:6–9, and that it was "[n]ot my purpose to buy it for myself," *id.* at 501, 29:19–30:5.  That is significant, according to Sprigg, because a nonprofit is not a consumer. *See* Mem. in Supp. of Mot. for Sanctions at 6.  Zuver's counsel counters that it did not hide Zuver's intentions for the purchase—"[t]he property was going to be used as Mr. Zuver's personal residence, and eventually Mr Zuver had hopes of using it for his nonprofit as an art center," Compl. ¶ 39—and that an individual who purchases a property with intent to use it for a nonprofit is nonetheless a consumer.  *See* Opp'n to Mot. for Sanctions at 13.

Although the problems raised by Sprigg's motion for sanctions are troubling, on the whole, they are not so egregious as to warrant sanctions.  There is no doubt that Zuver's counsel could have done better at ensuring that the complaint was consistent with Zuver's own story.  It is also true that in certain respects the complaint misrepresents what actually happened, arguably beyond what can be chalked up to zealous advocacy.  *See, e.g.*, *supra* pp. 20–23; Compl. ¶ 8 (asserting that Sprigg "ha[d]" Zuver enter into and release the contracts "in an effort to deplete Mr. Zuver of any and all cash available"); Dkt. 32-1 at 187 (Sprigg emailing Castillo in July 2014: "Please remind [Zuver] that I'm committed to selling the house as soon as possible. . . . We've been working on this since November 2013 when he first approached me to buy the house and I really must move on with my life.  I'm missing a number of opportunities while we wait this out, have already lost two strong possible buyers . . . in the past year, and am missing other investment opportunities, too."); *id.* at 320–21 (Castillo and Zuver imploring Sprigg in November 2014 for yet another extension on settlement).  But as noted, at least some of the inconsistencies seem to have resulted from confusion on the part of Zuver.  And while the Court agrees with Sprigg that many of Zuver's counsel's legal arguments are unconvincing, courts

cannot sanction plaintiffs' lawyers each time a claim loses handily.  That said, the Rule 11 motion is itself far from frivolous given the significant problems it identifies.

### 2.  Disclosure of Confidential Meditation Communications

The Court is most troubled by Zuver's counsel's breach of the confidentiality provision of the mediation agreement.  At the conclusion of mediation, the parties signed an agreement affirming that "[a]ll statements, documents and other matters generated in connection with the mediation are confidential."  Dkt. 34-4 at 30.  The agreement clarified that "any communication made in or in connection with the mediation which relates to the controversy being mediated . . . is confidential."  *Id.*  The agreement further stated that with certain exceptions "[c]onfidential materials and communications are not subject to disclosure in discovery or in any judicial or administrative proceeding."  *Id.* at 31.  The only exception relevant here is for "communications . . . offered to prove or disprove a claim or complaint of misconduct or malpractice filed against a party's legal representative *based on conduct occurring during a mediation*."  *Id.* (emphasis added).  Despite these confidentiality provisions, in its opposition to Sprigg's motion for Rule 11 sanctions, Zuver's counsel disclosed that the mediator "made a mediator's proposal, which was accepted by plaintiff but not by defendant."  Opp'n to Mot. for Sanctions at 8; *see also id.* at 45 ("[T]he parties attended a mediation on November 10, 2017.  The parties exchanged offers, and ultimately the mediator made a proposal.  Plaintiff was agreeable, but defendant rejected the mediator's proposal.").  Anticipating a charge of misconduct, Zuver's counsel asserted in a footnote that the disclosure was allowed by the claim-of-misconduct exception.  *Id.* at 45 n.17.

As expected, Sprigg argued in his Rule 11 reply brief that Zuver's counsel's breach of the mediation agreement's confidentiality provision provided a further basis for sanctions.  *See* Rule

11 Reply at 25–27; Dkt. 34-3.  To ensure that Zuver's counsel had an adequate opportunity to rebut Sprigg's argument, the Court ordered Zuver's counsel to file a sur-reply.  *See* Minute Order of May 10, 2018.  Far from acknowledging any mistake, Zuver's counsel persisted with its claim-of-misconduct argument and boldly asserted additional—and equally unconvincing— arguments to defend the disclosure.  *See* Rule 11 Sur-reply at 4–6, Dkt. 37.

The Court does not find Zuver's counsel's initial justification or counterarguments compelling.  The mediation agreement's claim-of-misconduct exception applies only to claims that misconduct occurred *during mediation*.  Sprigg's Rule 11 motion was plainly directed at the filing of the complaint, not at Zuver's or his counsel's conduct during mediation.  Mot. for Sanctions at 1, Dkt. 24 (moving the Court to "impose sanctions on Plaintiff and his counsel for bringing frivolous claims," not for conduct occurring during mediation); *see generally* Mem. in Supp. of Mot. for Sanctions (attacking the complaint as frivolous and making no mention of mediation); *see also* Fed. R. Civ. P. 11(b) (regulating attorney conduct when "presenting to the court a pleading, written motion, or other paper" and not regulating conduct occurring during mediation).

Nonetheless, Zuver's counsel argues that because Sprigg "seeks *all of his fees and costs* as a remedy" in his Rule 11 motion, the motion should be characterized as a "broad-based attack on [Zuver's] pursuit of his claim" that extends to mediation.  Rule 11 Sur-Reply at 4.  But the complaint was a but-for cause of all of Sprigg's fees and costs, and the Rule 11 motion could not make clearer that the motion was not "based on" mediation.

Zuver's counsel further argues that the disclosure was "justified to demonstrate [Zuver's] claim that [Sprigg's] motion was an attempt to intimidate [Zuver] after a failed mediation."  *Id.*  Yet at the same time, Zuver's counsel acknowledges that Zuver's testimony conflicted with the

complaint in several ways.  *See, e.g.*, Opp'n to Mot. for Sanctions at 36.  As noted, there was

more than adequate material to justify Sprigg's Rule 11 motion.  *See supra* Section III.B.1.

More fundamentally, even if Sprigg *had* filed the Rule 11 motion with intent to intimidate Zuver,

the claim-of-misconduct exception still would not apply.  The exception applies to misconduct in

mediation, not misconduct in filing a Rule 11 motion.  At no time did Zuver's counsel present an

allegation that Sprigg or his counsel acted improperly in mediation.  Zuver's counsel, therefore,

cannot legitimately invoke the claim-of-misconduct exception.[4]

  Finally, Zuver's counsel argues that even if it did breach the mediation agreement, the

breach was no big deal because "[t]he statements about the mediation were extremely limited,

high-level, and devoid of detail."  Rule 11 Sur-reply at 4.  The Court disagrees.  By informing

the Court that the mediator made a proposal that was accepted by Zuver and rejected by Sprigg,

Zuver's counsel disclosed the very heart of the mediation proceeding.  The fact that Zuver's

counsel did not reveal the amount of the mediator's settlement offer does not lessen the clear

import of the disclosure—that Zuver and not Sprigg acted reasonably.  And Zuver's counsel

divulged this information to the Court—the decisionmaker on the sanctions and merits motions.

Given that Zuver's counsel cited the relevant provision of the mediation agreement in the very

same brief, *see* Opp'n to Mot. for Sanctions at 45 n.17, moreover, there is no doubt that counsel

made a strategic decision to disclose.

  The intentional decision to bypass the confidentiality provision is no small thing.  "Strict

confidentiality regarding details of mediation discussions is the touchstone of any effective

---

[4] If a compelling justification for disclosure had existed, Zuver's counsel could have acted in
good faith by submitting a filing with the Court explaining why it thought disclosure was
necessary and the claim-of-misconduct exception applicable.  That would have allowed the
Court to address the argument ex ante.

mediation program," and Zuver's counsel's disclosure "reflects a near cavalier disregard for that important principle." *Spoth v. M/Y Sandi Beaches*, 2010 WL 2710525, at *6 (W.D.N.Y.). Wrongful disclosure "can have a chilling effect on settlement discussions" and can "make parties reluctant to engage in a frank exchange of information, perceiving that their disclosures [might] be subsequently used against them." *Williams v. Johanns*, 529 F. Supp. 2d 22, 23 (D.D.C. 2008); *see also, e.g.*, *Griego v. Douglas*, 264 F. Supp. 3d 1109 (D.N.M. 2017) ("Empirical research demonstrates that lawyers have serious concerns about their ability to be candid and fully discuss issues about the case with the judge at settlement conference." (citing Nancy A. Welsh, *Magistrate Judges, Settlement, and Procedural Justice*, 16 Nev. L.J. 983, 1011 (2016))); *Lake Utopia Paper Ltd. v. Connelly Containers, Inc.*, 608 F.2d 928, 930 (2d Cir. 1979) ("If participants cannot rely on the confidential treatment of everything that transpires during [alternative dispute resolution] then counsel of necessity will feel constrained to conduct themselves in a cautious, tight-lipped, non-committal manner more suitable to poker players in a high-stakes game than to adversaries attempting to arrive at a just resolution of a civil dispute. This atmosphere if allowed to exist would surely destroy the effectiveness of [alternative dispute resolution]."); *Goodyear Tire & Rubber Co. v. Chiles Power Supply*, 332 F.3d 976, 980 (6th Cir. 2003) ("The ability to negotiate and settle a case without trial fosters a more efficient, more cost-effective, and significantly less burdened judicial system.  In order for settlement talks to be effective, parties must feel uninhibited in their communications.").  For these reasons, courts routinely impose sanctions on attorneys who disclose confidential mediation communications. *See, e.g.*, *Bernard v. Galen Group*, 901 F. Supp. 778, 784 (S.D.N.Y. 1995) (imposing monetary sanctions for disclosure of confidential mediation communications); *Frank v. L.L. Bean Inc.*, 377 F. Supp. 2d 233, 240 (D. Me. 2005) (same); *Davis v. Kan. City Fire & Marine Ins.*, 195 F.R.D.

33, 38 (N.D. Okla. 2000) (same); *Alexander v. Philip Morris USA*, 2008 WL 2704464, at *3

(N.D. Okla. 2008) (same); *Spoth*, 2010 WL 2710525, at *6 (same); *Williams*, 529 F. Supp. 2d at

24 (holding a lawyer in civil contempt for violating a magistrate judge's order of confidentiality

in mediation); *see also In re Fort Totten Metrorail Cases*, 960 F. Supp. 2d 2, 16 (D.D.C. 2013)

("[B]reaches of [a mediation] agreement requiring confidentiality may be redressed in a separate

civil suit.").

While Zuver's counsel is to be commended for opting to represent Zuver on a pro bono

basis, pro bono counsel are held to the same ethical standards as other attorneys who appear in

federal court.  For the reasons stated, Zuver's counsel's conduct fell short of these standards.

Given that the injury to Sprigg and the judicial system caused by the disclosure is difficult to

quantify, the Court imposes as a sanction only those costs that are directly attributable to Zuver's

counsel's intentional disclosure—the fees associated with Sprigg's response to Zuver's counsel's

breach of confidentiality.

## CONCLUSION

In addressing Counts III, VI, and VIII—the claims of undue influence, fraud, and

fiduciary duty—the Court considered a matter outside the pleading; namely, the undisputed fact

that Zuver and Sprigg had no precontractual relationship.  For that reason, the Court cannot

dismiss those counts under Rule 12(b)(6).  But because the counts do not state a claim without an

allegation of a precontractual relationship, no genuine dispute of material fact can exist.  The

Court therefore grants summary judgment to Sprigg with respect to Counts III, VI, and VIII.

The Court grants Sprigg's Motion to Dismiss, Dkt. 7, with respect to the other counts, which are

Counts I, II, IV, V, and VII.  The Court denies Sprigg's Motion for Rule 11 Sanctions, Dkt. 24.

Finally, the Court awards Sprigg the fees associated with his argument regarding the breach of

confidentiality.  A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

Date: June 13, 2018